IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

EMILY NANOUK,

                Plaintiff,

vs.

UNITED STATES OF AMERICA,

                Defendant.

Case No. 3:15-cv-00221-RRB

**ORDER DENYING
MOTION TO DISMISS
WITHOUT PREJUDICE
Docket 232**

## I.   INTRODUCTION

Before the Court is Defendant, the United States of America, with a Motion to Dismiss for Lack of Subject Matter Jurisdiction.[1]  Plaintiff, Emily Nanouk, opposes,[2] and Defendant replies.[3]

### A.    Background

The underlying facts of this matter are well known to the parties and previously have been discussed by the Court.  During the Cold War, the United States Air Force relied upon a communication system known as the White Alice Communication System, comprised of strategically located relay stations in remote Alaska to monitor

---

[1] Docket 232.
[2] Docket 252.
[3] Docket 256.

Soviet activities. At issue here is a site known as the North River Relay Station ("NRS"),[4] which was located eight miles east of the village of Unalakleet, Alaska, "situated on a hilltop above the banks of the Unalakleet River at about 500 feet above mean sea level . . . on mostly gravel fill."[5]

The White Alice sites were operated primarily by contractors, with little direct supervision from the Air Force. Given the remoteness of the sites and the hazardous weather, the stations required the use of high voltage transformers to operate, which, in turn, required the use of transformer oil containing PCBs.[6] It is the disposal methods associated with this oil that led to much of the contamination that later was discovered at the sites. The NRS closed in 1979 and, when the White Alice system closed, the contractors departed the various stations and left behind the hazardous waste. Some of this waste ultimately contaminated Plaintiff's Native Allotment, giving rise to the instant dispute.

Hazardous waste cleanup at formerly used defense sites ("FUDS") was first initiated in 1983 when funding became available, and sites were prioritized on a "worst first" basis, meaning that sites with higher risk to human health and environment generally

---

[4] The parties, this Court, and the Court of Appeals referred to this location as the North River Station, North River Relay Station, North River Radio Relay Station, North River RRS, NRRRS, and NRS. For simplicity this Court refers to it as the NRS.

[5] Docket 151-27.

[6] PCBs are Polychlorinated Biphenyls, "a broad family of man-made organic chemicals known as chlorinated hydrocarbons. PCBs were manufactured domestically from 1929 until manufacturing was banned in 1979." https://www.epa.gov/pcbs/learn-about-polychlorinated-biphenyls-pcbs (last visited February 24, 2023).

*Nanouk v. United States*                                    Case No. 3:15-cv-00221-RRB
Order Denying Motion to Dismiss                                                  Page 2
Case 3:15-cv-00221-RRB   Document 263   Filed 03/15/23   Page 2 of 23

were considered first in the priority-setting process.[7] There were over 10,000 FUDS locations nationwide, with as many as 532 in Alaska.

Assessment of the NRS site took several years, and it was not until 1989 that the findings based on the assessment brought NRS formally within the scope of the DoD's Defense Environmental Restoration Program ("DERP"), making it eligible for the funds designated to clean up FUDS.[8] The NRS site at issue here was designated as "medium" risk by the Air Force in December 1990.[9] An extensive report entitled "Environmental Assessment and Finding of No Significant Impact," was produced by the U.S. Army Corp of Engineers in November 1991.[10] Analysis of soil samples indicated five areas of contamination requiring remediation at NRS, with PCBs found at some of those locations, none of which included the hotspot at issue here.[11] The Army Corp of Engineers delegated assessment and cleanup activities to civilian contractors.[12]

In the summer of 2003, thirteen years after funding first was earmarked for cleanup of the White Alice sites, the Air Force conducted a "complete site assessment and inspection" to "identify all contamination sources and potential contamination sources," and invited the local community to express concerns. It was during this assessment that Plaintiff brought the PCB hot spot giving rise to this litigation to the attention of the Air Force.[13] The location covered an elliptical area about 15 feet by 40 feet in a location that,

---

[7] Docket 232 at 8.
[8] *Id.* at 9.
[9] Docket 152-5 at 19.
[10] *See* Docket 151-25. A location map is found at page 15 of this report.
[11] *Id.* at 4.
[12] Docket 232 at 11.
[13] It is unclear to the Court when Plaintiff became aware of the hotspot.

*Nanouk v. United States*                                    Case No. 3:15-cv-00221-RRB
Order Denying Motion to Dismiss                                              Page 3
Case 3:15-cv-00221-RRB   Document 263   Filed 03/15/23   Page 3 of 23

according to the Government's brief, "may have been used for drum storage."[14]  The hot spot contained over 40,000 ppm of PCB.[15]  Contamination of Plaintiff's property occurred when vehicles were driven over the hot spot on their way to Plaintiff's cabin.

## B.      The Federal Tort Claims Act

The United States generally is immune from liability unless sovereign immunity has been clearly waived.  The Federal Tort Claims Act (FTCA) waives the United States' sovereign immunity:

> for claims seeking money damages "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."[16]

The waiver, however, is not absolute, and does not extend to discretionary or judgmental decisions of the sovereign.[17]  This discretionary function exception:

> preserves the United States' immunity from suit as to any claim "based upon the exercise or performance or the failure to exercise or perform a **discretionary function or duty** on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." [28 U.S.C.] § 2680(a).  The government bears the burden of establishing that the exception applies.[18]

---

[14]  Docket 232 at 17.
[15]  Docket 25 at 3.  Acceptable levels of PCB, as established by the EPA, permit up to 25 ppm in low occupancy areas.  40 C.F.R. § 761.61(a)(4)(i)(B).
[16]  *Nanouk v. United States*, 974 F.3d 941, 944 (9th Cir. 2020) (citing 28 U.S.C. §§ 1346(b)(1) and 2674).
[17]  *See* 28 U.S.C. § 2680(a).
[18]  *Nanouk*, 974 F.3d at 944 (citing *Chadd v. United States*, 794 F.3d 1104, 1108 (9th Cir. 2015) (emphasis added)).

*Nanouk v. United States*                                                        Case No. 3:15-cv-00221-RRB
Order Denying Motion to Dismiss                                                                    Page 4
Case 3:15-cv-00221-RRB   Document 263   Filed 03/15/23   Page 4 of 23

Discretionary functions are defined as acts or omissions involving "an element of judgment or choice."[19]  If the Government employee's conduct involves an element of judgment or choice, courts then consider whether the discretionary judgment was "grounded in social, economic, [or] political policy," because Congress has sought to preclude courts from second-guessing such decisions.[20]  The exception is broad, sheltering "actions taken on the basis of erroneous facts, the failure to exercise available discretion in any way, the failure to perform supervisorial tasks, and the failure to enforce effectively regulatory orders."[21]  The exception applies whether or not the activity involved is viewed as planning or operational,[22] or "whether or not the discretion involved be abused."[23]  In short, "*whether* the government was negligent is irrelevant to the applicability of the discretionary function exception, . . . [but] *how* the government is alleged to have been negligent is critical."[24]

But "[t]he distinction between protected and unprotected actions and decisions has proven itself to be a particularly vexing determination for district and appellate courts alike."[25] Governmental actions "can be classified along a spectrum, ranging from those 'totally divorced

---

[19] *Id.* at 945 (citing *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)). ("If the act did not involve an element of judgment or choice, the analysis ends there and the plaintiff's claim may proceed.")

[20] *Id.* (citing *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984)).

[21] *Baker v. United States*, 817 F.2d 560, 564 (9th Cir. 1987); *see also Terbush v. United States*, 516 F.3d 1125, 1129 (9th Cir. 2008) ("Even if the decision is an abuse of the discretion granted, the exception will apply.").

[22] *See United States v. Gaubert*, 499 U.S. 315 (1991).

[23] 28 U.S.C. § 2680(a).

[24] *Whisnant v. United States*, 400 F.3d 1177, 1185 (9th Cir. 2005) (emphasis original) (Finding that if plaintiff "were claiming that the government was negligent in electing to employ contractors rather than doing the work itself, or in designing its safety regulations, then his claim would most likely be barred; instead, he is claiming that the government negligently ignored health hazards that were called to its attention, and so his claim is not barred.").

[25] *Terbush*, 516 F.3d at 1129.

from the sphere of policy analysis,' such as driving a car, to those 'fully grounded in regulatory policy,' such as the regulation and oversight of a bank."[26]

"For a[n FTCA] complaint to survive a motion to dismiss, it must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime."[27] "The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis."[28] Plaintiff stresses that "because the FTCA is intended to remedy harm caused by the Government, 'it should be construed liberally, and its exceptions should be read narrowly."[29]

## C.    Procedural History

In 2018, this Court found:

> [A]fter considerable effort on the part of the Air Force, PCB contamination has been remediated.  While one might debate the speed of the [Government's] efforts over the years, it cannot be seriously doubted that discretion was exercised, policy analyzed, and judgment employed, be it good or bad, in addressing the matter, in overseeing various contractors, and in determining when and how to proceed with remediation efforts.[30]

This Court further found that "environmental remediation on the part of the Government in situations such as this is properly viewed as a discretionary function of the government

---

[26]    *Id.* (citation omitted).
[27]    *Gaubert*, 499 U.S. at 324–25.
[28]    *Id.* at 325.
[29]    Docket 252 at 20 (citing *Terbush*, 516 F.3d at 1135).
[30]    Docket 194.

*Nanouk v. United States*                                                      Case No. 3:15-cv-00221-RRB
Order Denying Motion to Dismiss                                                                  Page 6
Case 3:15-cv-00221-RRB   Document 263   Filed 03/15/23   Page 6 of 23

for which the government cannot be held liable," concluding that the discretionary function exception protected Defendant from Plaintiff's claims arising from the contamination and the subsequent environmental remediation efforts which all impacted her property.[31] This Court accordingly determined that it lacked subject matter jurisdiction, in the absence of a valid FTCA claim, and entered Judgment in favor of Defendant.[32] Plaintiff appealed.[33]

On September 4, 2020, the Ninth Circuit Court of Appeals issued a decision agreeing, in part, "that the discretionary function exception bars Nanouk's claims to the extent they are predicated on two of the three acts she challenges as negligent."[34] The Ninth Circuit observed that:

> Nanouk predicates her claims on three distinct actions . . . that she alleges created the hot spot and led to the contamination of her property. First, she contends that during the period of the North River Station's operation (1957–1978), the Air Force failed to prevent PCBs, which are found in used transformer oil, from being dumped on the ground. Second, she asserts that after the station closed, the Air Force and the Army Corps essentially abandoned the site, leaving behind barrels containing PCBs and allowing their contents to leak into the soil. Third, she argues that once the Air Force and the Army Corps redirected their remediation efforts toward the North River Station in 1990, they failed to discover and clean up the hot spot in a timely manner.[35]

---

[31] *Id.*
[32] Docket 195.
[33] Docket 202.
[34] *Nanouk*, 974 F.3d at 942.
[35] *Id.* at 945.

Acknowledging the discretionary nature of the decisions involved here, the Court of Appeals held that the Government would prevail "if it can show that the decision[s] challenged by the plaintiff [were] 'susceptible to policy analysis.'"[36]

The Ninth Circuit agreed that the discretionary function exception barred liability based on the handling of PCBs during the station's operation and its abandonment of the station between 1978 and 1990, finding that "the government had discretion to decide when and how to conduct the remediation," and that "no mandatory and specific directive required the government to complete the process within a specific timeframe."[37] But the panel held that that the Government had not definitively established that the exception barred liability based on the delay in discovering and remediating the hot spot between 1990 and 2003. The panel was "unable to determine whether the government's decisions were 'grounded in a social, economic, and political policy,'" because the Government "has not identified any competing policy considerations underlying the 13-year delay in discovering the hot spot and commencing removal of the PCBs from the affected area."[38] The Court of Appeals found that the Government's "general appeal to limited resources," and "focus[] on its decision in the 1980s to prioritize sites posing graver risks of environmental harm" was inadequate to trigger the discretionary function exception.[39] Although the Court of Appeals found that such policy considerations justified the abandonment of the station between 1978 and 1990, they did not automatically shield the

---

[36] *Id.* (citing *Gaubert*, 499 U.S. at 325).
[37] *Id.* at 945–49.
[38] *Id.* at 949–50.
[39] *Id.* at 950.

Government from liability for subsequent delays. In other words, once the Government turned its attention to the NRS in 1990, "its failure to conduct the clean-up in a timely manner thereafter was 'not the result of a policy choice,' but 'simply a failure to effectuate policy choices already made.'"[40]

While the Ninth Circuit left open the possibility that "the government may have been conducting environmental remediation at higher priority sites throughout the 13-year period of delay, thus preventing it from directing sufficient resources to the North River Station," it found that the Government had not made an adequate factual showing of this. Acknowledging that the discretionary function exception may still protect the Government's weighing of competing policy considerations, the Court of Appeals remanded the third issue to this Court specifically to consider whether the delay in pursuing remediation at the NRS involved decisions "susceptible to policy analysis," such that the discretionary function exception should apply.[41] Accordingly, this Court invited further briefing, and oral argument was held on February 1, 2023.

## II.   DISCUSSION

### A.    Issue on Remand

It is the law of the case that any decisions made from 1979 through 1990 are protected by the discretionary function exception. The issue on remand is whether the decisions made between 1990 and the discovery of the hotspot in 2003 were decisions

---

[40]   *Id.* (citing *Camozzi v. Roland/Miller & Hope Consulting Group*, 866 F.2d 287, 290 (9th Cir. 1989)).

[41]   *Nanouk*, 974 F.3d at 950.

based on policy, and therefore also subject to the discretionary function exception, or whether they simply were failure to effectuate the policy choices already made.

The Government argues that because CERCLA[42] regulations explicitly allow the Government discretion "to take any response action at any particular time," that its actions from 1990 forward "must be presumed" to be grounded in policy where a policy explicitly or impliedly allows for discretion.[43] But Plaintiff, noting that the failure to effectuate policy choices is not protected by the discretionary function exception, argues that "the government's own reports admit to its failures" with respect to inadequate testing, ignorance of prior evidence of PCB at the site, and the reliance on reports generated despite inadequate recordkeeping.[44]

The Government claims that multiple policy considerations factored into the timing and scope of remediation at the 260-acre site, including the deployment of finite resources to cleanup dozens of other sites in Alaska.[45] It maintains that "environmental remediation at higher priority sites . . . prevented it from directing sufficient resources to the North River Station," and that these competing needs and other policy reasons factored into the timing of the identification and remediation of the hotspot.[46] It argues that such

---

[42] 42 U.S.C. § 9601 et seq. "The Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), commonly known as Superfund, was enacted by Congress on December 11, 1980. This law created a tax on the chemical and petroleum industries and provided broad Federal authority to respond directly to releases or threatened releases of hazardous substances that may endanger public health or the environment." https://www.epa.gov/superfund/superfund-cercla-overview (last visited March 2, 2023).
[43] Docket 256 at 7 (citing 40 C.F.R. § 300.400(i)(3)); Lam v. United States, 979 F.3d 665, 681 (9th Cir. 2020).
[44] Docket 252 at 18.
[45] Docket 232 at 24–29. Elsewhere the site is described as 216 acres.
[46] Id. at 5.

decisions involved weighing competing policy considerations, such as prioritizing cleanup of sites with higher environmental risks, allocating limited resources, and mobilizing to remote sites.[47]  **Defendant argues that these decisions also concerned safety, and that "balancing competing safety considerations is a protected policy judgment."[48]  Thus, the Government argues that every decision that led to the discovery of the PCB hotspot in 2003, and not earlier, was susceptible to policy analysis.

## B.    1990 through 1996

In December 1990, the NRS received its first ranking for relative risk, which the Air Force designated as "medium" in relation to "an average of 69 other properties per year during the 1990s."[49]  The Army Corp of Engineers conducted the first step of the investigation, purportedly focusing on areas near structures which were most likely to contain contamination, arguably a policy decision following the "worst first" triage.

According to the Government's brief, five specific "areas of contamination" were identified for cleanup in NRS by **November 1991**.[50]  Active cleanup of the NRS began in **June 1993**, but the first contractors who performed the work went out of business, leaving the work incomplete.  In **1994**, CH2M Hill issued a report indicating that more cleanup and sampling was required.  A second contractor performed cleanup work in **1995–**

---

[47] *Id.* at 25–29.
[48] Docket 256 at 14 (citing *Bailey v. United States*, 623 F.3d 855, 862 (9th Cir. 2010) (Noting that "balancing competing safety considerations is a protected policy judgment.")).
[49] Docket 232 at 9.
[50] A map of "Zone 1" of the NRS site is found at Docket 152-5 at 20.  A map identifying the location of specific contamination is found at Docket 151-27.

*Nanouk v. United States*                                                     Case No. 3:15-cv-00221-RRB
Order Denying Motion to Dismiss                                               Page 11
Case 3:15-cv-00221-RRB   Document 263   Filed 03/15/23   Page 11 of 23

**1996**, but the Army Corps of Engineers, noting inadequate documentation by the second contractor, found the work inadequate and took on responsibility for a final report.

Plaintiff argues that the Government's failure to inspect the site, knowing that its contractors defaulted and failed to provide reports, was not grounded in social, economic, or political policy intended to shield the Government from tort liability, particularly in light of the evidence of PCBs on the site. The Government argues that any attempt to base liability on a lack of inspection of contractor work is barred by the discretionary function exception.[51]

Indeed, reliance on civilian contractors to perform cleanup is a policy decision, and "the term 'Federal agency' . . . does not include any contractor with the United States."[52] But there usually is some overlap between the Government's responsibilities and the work of civilian contractors. While the decision to delegate responsibilities to a contractor is a discretionary function, it still is possible for the Government to be responsible for its negligence with respect to any retained responsibilities. For example, in *Camozzi v. Roland/Miller & Hope Consulting Group*, the Government hired contractors to build a new postal facility.[53] The Ninth Circuit found that the Government's failure to discover the floor openings through which plaintiffs fell was not a "political, social, [or] economic judgment of an agency exercising its regulatory function."[54] Rather, while the decision to delegate the responsibility to a contractor is a

---

[51] Docket 256 at 13.
[52] *See* 28 U.S.C. § 2671.
[53] 866 F.2d 287 (9th Cir. 1989).
[54] *Id.* at 289.

discretionary function, the "negligence of USPS in performing its *retained* safety functions . . . involved no policy choices."[55]  "Failure to inspect floors for uncovered and unguarded openings, for example, was not the result of a policy choice by the particular employees or agents involved.  It simply was a failure to effectuate policy choices already made and incorporated in the contracts."[56]

Here, the Government dismissed the civilian contractors for sub-par work as of 1996 and took responsibility for a "final report," which was not produced until 2001. The mere use of Government contractors in this instance does not absolve the Government from its overall responsibility to remediate the site, a task it took on beginning in 1990. After the various contractors quit, went bankrupt, or were fired, the Corp took on responsibility for the report.  Given the lack of documentation by the contractors, the Government's failure to inspect the site after the contractors departed was not a policy choice.

## C.    1996 through 2001

It is unclear what, if any, activity occurred at NRS between **1996 and 2001.** The affidavit of Kenneth Andraschko indicates that as of 1996, "North River became ineligible for the FUDS program and [the Army Corps] could no longer perform physical work on the site.  The Air Force had to resume responsibility for any remaining environmental restoration."[57]  But the Air Force also was actively working to remediate

---

[55] *Id.* at 290 (emphasis added).
[56] *Id.*
[57] Docket 232-10 at 5.  Kenneth Andraschko was the program Manager and Supervisory Environmental Engineer of the DERP-FUDS program for the Army Corp of Engineers in Alaska since July 2007.

other installations in Alaska and, citing a lack of sufficient resources, opted to wait for the Army Corp to complete its report, and to then evaluate what additional actions were necessary for environmental restoration at the NRS.[58] So although the Army Corp of Engineers apparently lost funding for the site in 1996, the Air Force opted to wait for a report from the Corp, which it did not receive until 2000 or 2001, before taking over at the site.

But the record contains a "Management Action Plan" dated November 7, 1997, which was prepared for the Air Force and Army Corp by an environmental consulting company.[59] This report "identifies all known contaminated sites" and the "environmental condition of property."[60] The history of installation operations table indicates that with respect to hazardous substance activities, although cleanup activities occurred from 1982 to 1985, there was no activity between 1986 and 1995.[61] Various maps are included in the report, including one showing the "location of past hazardous substances and petroleum activities,"[62] one showing the current environmental condition of the property,[63] and one showing the Installation Restoration Program (IRP) sizes and zones under investigation.[64] It purported to provide "a master schedule of planned and anticipated activities to be performed throughout the duration of the Environmental

---

[58] *See* Docket 232 at 27–28.
[59] Docket 152-5.
[60] *Id.* at 3.
[61] *Id.* at 9.
[62] *Id.* at 10.
[63] *Id.* at 14.
[64] *Id.* at 20. This map indicates that the majority of the White Alice site was considered as a single "zone."

Restoration Program," but "figure 5-1" detailing the schedule is not included in the exhibit.[65]  The report indicated that it would be updated a minimum of once per year.[66]

The Court sees a number of problems with the Government's reliance on the policy argument during these five years.  First, briefing indicates that the Army Corp of Engineers started its "field confirmation investigation" of the prior demolition and cleanup activities in **1999**.[67]  Having lost funding in **1996**, the Corp presumably was not performing any physical cleanup during those three years.  (Indeed, the 1997 report discussed above suggests there was no environmental cleanup since 1985, possibly due to a lack of recordkeeping by the contractors).  Meanwhile, the Air Force opted to wait for a final report from the Corp, which was not produced until 2001.  Between 1996 and 2001, therefore, neither the Army Corp of Engineers nor the Air Force apparently was taking *any* action at all with respect to cleanup of the site, despite the general knowledge that PCBs had been present, that two contractors had generally failed to perform adequate cleanup, and that a 1997 report existed regarding the status of the site.

D.    **Analysis**

After the Army Corp of Engineers lost funding for the NRS, responsibility was transferred from the Corp to the Air Force.  But while the Corp continued to evaluate the site until 1999, producing a report in 2001, the Air Force apparently was responsible for the site as the landowner starting in 1996.  During this period, the station was classified

---

[65]  *Id.* at 3, 25.
[66]  *Id.* at 5.
[67]  Docket 232 at 13.

as "low risk" by the Air Force, which the Government argues was giving priority to other "higher risk" sites. But when the Air Force investigated "the nature and extent of remaining contamination at the site" to determine whether additional cleanup was needed, it restarted cleanup in **2002** *from the first step in the process* (i.e., identification of "Areas of Concerns/ Designation of New Sites") because "information pertaining to historical operations and past waste-management practices at the installation was scarce."[68] The site previously had been designated as a "medium risk." The Court questions what policy was involved in downgrading a "medium" risk site to a "low" risk site when there was little information upon which to do so, and when there was no apparent reason to assume that the site had improved, relative to other sites. In short, it does not appear that legitimate policy decisions were involved in reducing the risk level of the site when only minimal information was available to do so.

Moreover, in 2001, the Army Corps of Engineers found that the cleanup actions in the 1990s "did not dispose of all fuel drums and miscellaneous debris scattered in the vicinity of Unalakleet," finding approximately 3,300 fuel drums that still required disposal.[69] Despite this finding, the Corp provided a Final Remedial Action Report[70] to the Air Force in **December 2001**, with a cover letter from the NRS Project Manager Douglas Wooten, that indicated that AECI (one of the contractors who did not complete the work) had "concluded that the only **known** remaining contamination is mixed

---

[68] Docket 232 at 16 (citing Docket 151-27 at 9).
[69] *Id.* (citing Docket 152-18 at 4).
[70] Identified by Doug Wooten as the Corps' "official final document." Docket 152-9 at 2.

petroleum products in the soil" near a former underground storage tank."[71] The Government's brief added that "no further PCB contamination was detected,"[72] which is a broad interpretation of the report cited.[73] The Government's statement that no further PCB was detected fails to acknowledge that the information was based on a "pre-draft" of the "Summary of Remaining Waste" section of the report drafted by AECI, which went out of business before finishing the job.[74] The failure to detect contamination does not rule out its presence, and the draft report from which the Government draws this misleading conclusion was not a final report. Moreover, it is unclear if this report encompassed only "Zone 1," or the wider area around the White Alice site where the hotspot was located.

At best, neither the Corp nor the Air Force knew what risk level to assign to the NRS, as they were back to step one of the process over twenty years after the site closed, and a decade after first receiving funding for cleanup. A December 2002 email from Douglas Wooten stating that the CERCLA cleanup process for the NRS was still a few years from completion because "other sites with higher priorities (higher risk) have taken precedence,"[75] does not support the Government's "competing policy" argument given the scarcity of information about the site's contamination status. An "unknown risk" is not a "low risk." Wooten's email provides no other information regarding the higher risk sites.

In an attempt to justify the passage of time, the Government explained at oral argument that "an installation could have multiple contaminated sites," which was true of

---

[71] *Id.* (emphasis added).
[72] Docket 232 at 13–14; *see also* Docket 152-9, Docket 152-10.
[73] *See* Docket 152-8 at 11–12.
[74] *Id.* at 12.
[75] Docket 152-13 at 3.

Order Denying Motion to Dismiss

Case No. 3:15-cv-00221-RRB
Page 17

Case 3:15-cv-00221-RRB   Document 263   Filed 03/15/23   Page 17 of 23

the more than 200-acre site at issue here.[76]  Prioritization was necessary not only as to over

500 installations, but of cleanup for sites *within* each installation.   The Government

described environmental remediation as an "iterative" process,[77] which continually

implicates policy concerns during the four steps of environmental remediation:

(1) investigation of the installation for contamination; (2) cleanup; (3) assessing

effectiveness of cleanup; (4) reassessment to identify any further sources of

contamination.[78]   The implication is that just because the Government had not yet

discovered the hotspot in 2003, the "iterative process" was not complete, and therefore the

Government could not be faulted for not cleaning it up sooner.  While this argument makes

the NRS sound like a large site, the 1997 report describes it as a "relatively small

installation" and designated only one "zone."[79]  However, the hotspot was located outside

of this zone, though still on Government property.[80]

　　　　With respect to the hotspot, Plaintiff argues that it sat in "plain view

throughout [the] 1990's," and that one Government employee testified that upon being

guided to the spot by Plaintiff in 2003, he immediately recognized the smell as that of a

solvent containing PCB.[81]  But the Government's reply brief disputes that the hotspot was

---

[76]  There is no transcript of the February 1, 2023, oral argument, but the Court has listened to the recording.
[77]  The Court understands an "iterative process" in the context of environmental remediation to be a cycle of steps which are repeated until the desired result is achieved.
[78]  The Court asked for more information regarding these four steps during oral argument.  Counsel for the Government indicated that the four steps were discussed in the Rafferty Declaration filed with the Government's motion.  But the Declaration of Michael Rafferty does not address these four steps of remediation.  Docket 232-8.
[79]  Docket 152-5 at 23.
[80]  *See* Docket 152-14 at 4; Docket 177-42 at 8.
[81]  Docket 252 at 7, 10.

in "plain view," and suggests that Plaintiff's assertion that it was in "plain view" is based on her misunderstanding of the location of the PCB hotspot in relation to the Equipment Maintenance Shop.[82]  According to various exhibits, including maps, the spot was located not far from the road.[83]

The Government argues that the "November 1991 Army Corps report . . . makes no reference to a PCB hot spot."[84]  But earlier, in the Government's opening brief, it *conceded* that the Army Corp performed "field reconnaissance" between 1985 and 1990, where contractors collected samples to identify areas of potential contamination, and that these samples "found evidence of petroleum contamination and potentially PCB contamination."[85]  It was the findings based on this site assessment that brought the NRS formally within the scope of DERP-FUDS, making the Army Corp the lead agency for cleanup.[86]  The suggestion that the report made no reference to a PCB "hotspot," while technically correct, is misleading.  Section 1.3 of the 1991 report entitled "Site Use History" clearly states that in 1982 the Air Force sent a team to "clean up and remove all PCB-contaminated electrical transformers.  In 1984, the Air Force returned to remove PCB-contaminated soils."[87]  But the 1987 field sampling still identified contaminants in the soil "throughout the site," including PCBs "from both ends of the Quonset hut garage

---

[82]  Docket 256 at 8.
[83]  *See*, for example, Docket 177-42 at 8.
[84]  Docket 256 at 8 (citing Docket 151-25 at 19 (Environmental Assessment and Finding of No Significant Impact, North River White Alice Communication Site Unalakleet, Alaska, November 1991)).
[85]  Docket 232 at 5 (citing Docket 151-25 at 6–7).
[86]  *Id.*
[87]  Docket 151-25.

at 320 ppb, and in the sample collected at the front door to the composite building at 600 ppb."[88]

Finally, the Government's brief suggests that the hotspot "may have been used for drum storage."[89]  But the December 2004 report entitled "Action Memorandum Time-Critical Removal" is less equivocal, stating that "PCB-containing oils and fluids were stored in drums at the North River RRS near the source area.  Historical aerial photographs also show this area being used for drum storage. . . . It has been determined that spills would have occurred prior to 1984, when all identifiable hazardous materials were removed from the site."[90]  Historical photos showing drum storage that predate 1984 suggest that the hotspot was ground the Government had already covered in the remediation process.

The location of the hotspot is relevant to the policy argument.  If it was close to one of the areas where PCB previously was identified, the Government's argument that more pressing matters prevailed becomes less persuasive.  If the spot is located elsewhere, it raises questions regarding how the spot was overlooked, and what else might have been missed.  The Government took on the task of cleaning up the NRS, which it commenced in late 1990 or 1991.  At this point, the Court is not convinced that the Government's conduct in failing to discover the hotspot on its property was the result of purely policy decisions.[91]  Rather, this matter may be more akin to those cases where the Government

---

[88]  Docket 151-25 at 13.
[89]  Docket 232 at 17.
[90]  Docket 152-20 at 5.
[91]  Indeed, would it have been discovered at all were it not for Plaintiff bringing it to the Air Force's attention?

has failed to effectuate policy choices already made, such as in *Camozzi, supra,* and *Oberson v. U.S. Dep't of Agric., Forest Serv.*[92]

In *Oberson,* injured snowmobilers brought an FTCA action against the U.S. Forest Service for negligently failing to correct or warn of a dangerous condition on the snowmobile trail where a snowmobiler was injured. The Ninth Circuit agreed with the district court's opinion that the Forest Service's decisions whether to and how to warrant the trails were grounded in policy considerations, but once the decision to warrant the trails was made, the Service had a duty to accomplish that task with reasonable care.[93] After raising the speed limit from 35 to 45 mph, the Service's failure to warn of a hazard that arose as a result of the increase in speed limit was not the result of a decision grounded in public policy or of a choice among competing policy considerations. The court concluded that "the Forest Service's failure to correct or warn of this hazard was not the type of discretionary decision that is shielded from tort liability."[94] Similarly, having begun the remediation process, and apparently already having had the opportunity to identify a significant hotspot requiring remediation, the delay that occurred between 1990 and 2003 may not have been the result of policy choices subject to the discretionary function exception.

---

[92] 514 F.3d 989, 996 (9th Cir. 2008).
[93] *Id.*
[94] *Id.*

Order Denying Motion to Dismiss

Case No. 3:15-cv-00221-RRB
Page 21

Case 3:15-cv-00221-RRB   Document 263   Filed 03/15/23   Page 21 of 23

## III.  CONCLUSION

The objection that a federal court lacks subject-matter jurisdiction may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment.[95]  "Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."[96]

Although Plaintiff bears the initial burden to establish subject matter jurisdiction under the FTCA, it is the Government's burden to establish that the discretionary function exception applies.[97]  When the jurisdictional motion "involv[es] factual issues which also go to the merits," a court should employ the standard applicable to a motion for summary judgment because "resolution of [those] jurisdictional facts is akin to a decision on the merits."[98]  In that posture, the moving party "should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law.  Unless that standard is met, the jurisdictional facts must be determined at trial by the trier of fact."[99]

Here, the parties do not seem to even agree on the location of the hotspot with respect to the buildings on the White Alice site.  The Government's argument relies

---

[95] *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506, 126 S. Ct. 1235, 1240, 163 L. Ed. 2d 1097 (2006) (citing Fed. R. Civ. P. 12(b)(1)).
[96] Fed. R. Civ. P. 12(h)(3).
[97] *Oberson v. U.S. Dep't of Agric.,* 514 F.3d 989, 997 (9th Cir. 2008).
[98] *Augustine v. United States,* 704 F.2d 1074, 1077 (9th Cir. 1983).
[99] *Augustine,* 704 F.2d at 1077 ("[W]here the jurisdictional issue and the substantive issue are so intertwined that the question of jurisdiction is dependent on factual issues going to the merits, the jurisdictional determination should await a determination of the relevant facts on either a motion going to the merits or at trial.").

on the iterative process and policy decisions which it alleges caused justifiable delays in discovery of the hotspot but, at this juncture, the Court is not convinced that the discretionary function exception applies. Moreover, if uncertainty exists as to the Government's knowledge of the hazard, "Plaintiffs' complaint cannot be dismissed at this stage, and the question of jurisdiction instead must await a determination on the merits."[100]

Given the foregoing, Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction is DENIED without prejudice. Upon further factfinding, the Court reserves the right to revisit the discretionary function exception. However, at this stage, the Government has not met its burden.

The stay previously entered at Docket 262 is hereby lifted. This matter shall now proceed in due course.

IT IS SO ORDERED this 15th day of March, 2023, at Anchorage, Alaska.

_/s/ Ralph R. Beistline_
RALPH R. BEISTLINE
Senior United States District Judge

---

[100] *See Young v. United States*, 769 F.3d 1047, 1052–53 (9th Cir. 2014) ("[T]he question whether the Park Service knew or should have known of the hazard created by the transformer is a disputed issue of jurisdictional fact that is 'so intertwined' with the substantive dispute that resolution of the former depends, at least in part, on resolution of the latter.").